TRAYLOR, J.*
In this proceeding to involuntarily terminate parental rights, we granted a writ of certiorari to determine whether the court of appeal correctly affirmed the trial court’s decision not to terminate parental rights and the trial court’s finding that to leave the children in their respective foster homes for the time being is in their best interest.

FACTS and PROCEDURAL HISTORY

C.R.B. and R.D.L. are the mother and father of G.J.L., an eleven-year-old boy, and M.M.L., an eight-year-old girl. The children’s mother, C.R.B., suffers from a bi-polar disorder and mild mental retardation. Their father, R.D.L., is physically infirm due to a serious heart condition. The State of Louisiana, Department of Social Services, filed a petition to terminate parental rights because the children had been in foster care continuously since 1998 and there was little hope of them ever returning to either of their parent’s permanent custody.
G.J.L. and M.M.L. were seven and four, respectively, when they first entered the custody of the State in April 1997. The children were removed from their mother’s custody, after the State investigated and validated allegations of sexual abuse Lof M.M.L. by C.R.B.’s boyfriend and failure to protect on the part of C.R.B. In April 1998, the children were returned to their mother for a 30-day trial placement, which was extended for two additional 30 and 60 day periods. C.R.B., who had since married, regained custody of her son and daughter from the State on August 6, 1998, and was placed under six additional months of supervision. However, on August 21, 1998, the children were again removed from C.R.B.’s custody on the grounds of neglect, due to C.R.B.’s failure to provide adequate food, stable housing, *83 and safe supervision. The father, R.D.L., was unwilling or unable to provide care for the children during any of this time, allegedly because of his heart condition. The children were adjudicated to be in need of care on September 23, 1998, and were subsequently placed in separate foster homes.
The State established case plans to work with the parents towards reunification. R.D.L.’s case plan provided that he maintain contact with the State, advise of any changes in his address or medical status, visit with the children, and work towards having a suitable home for his children to be returned to him. R.D.L. visited regularly with the children for a six-month period in 1999. However, after the visits were changed from a restaurant in Church Point, where R.D.L. lived, to the OCS office in Opelousas, R.D.L. gradually began seeing the children less and less and finally stopped altogether.[1] He has not seen them in over a year. He has never attended a family team conference or a court hearing.
C.R.B.’s case plan required that she acknowledge the abuse to the children and why they were placed in the State’s care, that she provide a suitable home and safe environment for the children, that she not associate with the perpetrator of sexual 13abuse upon her daughter, that she keep all appointments, including those for mental health, that she take her prescribed medication, and that she attend all court hearings and family team conferences. However, C.R.B. failed to establish stable housing, did not attend mental health appointments, did not take her medication properly, continued to associate with known sexual perpetrators, and continued to have serious difficulty managing money. Yet, C.R.B. visits regularly with her children and has attended nearly all court hearings.
The undisputed medical testimony at trial was that C.R.B. has a bi-polar disorder and is mildly mentally retarded with a cognitive dysfunction. Both experts in psychology testified that, in their opinion, C.R.B. could never be the children’s primary care-giver because of her mental health condition, but that she could possibly serve as a secondary care-giver. None of the parties argue that reunification of the children with C.R.B. or R.D.L. is likely. However, the parties do not dispute that C.R.B. loves her children and that much of why C.R.B. is unable to properly care for them is through no fault of her own, but is due to her mental disability.
The trial court further found that the evidence indicated that the children love their mother. G.J.L. expressed concern for his mother’s welfare and a desire to visit and maintain a relationship with his father as well. While M.M.L. appeared to be less attached to both her parents and her brother and appeared to have no real desire to continue a relationship with her father, she still exhibited concern for her mother’s well-being. Additionally, the trial court found that both children are fairly content and well-adjusted in their respective foster homes. In fact, G.J.L.’s foster mother would like to adopt him, although she is not interested in adopting both children. M.M.L.’s foster parents do not wish to adopt her; however, other persons in the community have expressed an interest in adopting M.M.L., although the State has no specific plans for her adoption as of yet.
^Taking all of these factual findings into consideration, the trial court concluded *84 that it was in the children’s best interest to maintain the status quo for the present time. Thus, the trial court denied the State’s petition to terminate parental rights, finding that the parents should not be punished simply because of their respective mental and physical handicaps and that they should be allowed to try and be secondary care-givers to their children. Additionally, the trial court concluded that there was no evidence in the record that future adoption of the children would be in their best interest, and that, as they were happy and content in their foster homes and able to maintain “some semblance of family input in their lives,” it was not in their best interests to uproot them again for an uncertain future adoption. Finally, the trial court noted that if C.R.B. and R.D.L. “knowingly and willingly falter” in their roles as secondary care-givers, “this matter can be addressed again and parental rights terminated.”
On review, the court of appeal found that the trial judge grappled with the question of whether the children are better off with no parents and the chance to be adopted or with parents who love them but cannot care for them and concluded that the trial judge was “earnestly sincere” in his belief that the children’s best interest is not served by the termination of parental rights. The court of appeal pointed to what it considered the “underlying ambivalence” of the family welfare professionals who testified at the hearing and determined that the State had not met its burden of clear and convincing proof that parental rights should be terminated. La. Ch.Code art. 1035. However, both courts recognized that, most likely, neither C.R.B. or R.D.L. will ever be the primary care-giver for these children.

LAW AND DISCUSSION

Lin Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982), the United States Supreme Court recognized that natural parents have a fundamental liberty interest in the care, custody, and management of their child and that the natural parents’ interest does not “evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.” The Court went on to acknowledge that, while the State has an “urgent interest” in a child’s welfare and in providing the child with a permanent home, as long as there is reason to believe that a positive, nurturing parent-child relationship exists, the State’s interest must favor preservation over severance of natural familial bonds. Id. at 766, 102 S.Ct. at 1401 (quoting Lassiter v. Department of Soc. Servs., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Thus, the Court found that parents who are faced with the possibility of forced dissolution of their parental rights must be provided with fundamentally fair procedures in order to ensure that children’s legal bonds are not erroneously severed from fit parents. Id. at 753-54, 102 S.Ct. at 1395.
In order to adequately protect the parents’ rights in termination proceedings, the Santosky Court held that the clear and convincing evidence standard of proof strikes a fair balance between the natural parents’ rights and the State’s concerns for the child’s welfare and placement in a permanent home. 455 U.S. at 769, 102 S.Ct. at 1403. The Court found that “such a standard adequately conveys to the fact-finder the level of subjective certainty about his factual conclusions necessary to satisfy due process.”[2] Id. Therefore, the *85 State’s interest in finding a child an alternative permanent home arises only when there is clear and convincing evidence that the Innatural parents cannot or will not provide a normal family home for the child. Id. at 767, 102 S.Ct. at 1402.
This court recently discussed the special concerns involved in cases of involuntary termination of parental rights in State in the Interest of C.J.K. and K.K., 00-2375, 00-2504 (La.11/28/00), 774 So.2d 107, and State in the Interest of J.A, 99-2905 (La.1/12/00), 752 So.2d 806, where we also explained that, in termination proceedings, courts must carefully balance the two private interests of the child and the parents. While the parents have a natural, fundamental liberty interest in the continuing companionship, care, custody and management of their children, Lassiter, supra, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. Lehman v. Lycoming County Children’s Servs. Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982). In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. See, e.g., State in the Interest of C.J.K and K.K., 774 So.2d at 113 (quoting State in the Interest of J.A., 752 So.2d at 811); State in the Interest of S.M., 98 0922, p. 15 (La.10/20/98), 719 So.2d 445, 452. As we stated in State in the Interest of J.A.:
The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.
752 So.2d at 811 (citations omitted).
This court has always recognized, however, that great care and caution must be exercised in these proceedings, because the permanent termination of the legal relationship existing between children and their biological parents is one of the most severe and drastic actions the State can take against its citizens. State in the Interest of J.A., 752 So.2d at 811. Parents have a natural, fundamental liberty interest in the continuing companionship, care, custody and management of their children, which warrants great deference and vigilant protection under the law. Id. Thus, we recognize that the potential loss to parents is grievous, “perhaps more so than the loss of personal freedom caused by incarceration.” Id. Because due process requires that a fundamentally fair procedure be followed when the State seeks to terminate the parent-child legal relationship, actions to terminate must be scrutinized very carefully. Id.
*86 Title X of the Louisiana Children’s Code governs the involuntary termination of parental rights. Article 1015 provides the specific statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. In order to terminate rights, the court must find that the State has established at least one of those statutory grounds by clear and convincing evidence. State in the Interest of J.A., 752 So.2d at 811 (citing La. Child. Code art. 1035(A); Santosky v. Kramer, supra ). Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child’s best interest. La. Child. Code art. 1039; State in the Interest of C.J.K. and K.K., 774 So.2d at 113; State in Interest of ML & PL, 95-0045, p. 4 (La.9/5/95), 660 So.2d 830, 832.

Statutory Ground for Terminating C.R.B.’s and R.D.L.’s Rights

| sIn the present case, only the State has discussed in any detail whether it met its burden of proving one of the statutory grounds for termination of parental rights by clear and convincing evidence. See La. Child. Code arts. 1015 and 1035. Presumably, this is because no party or court has disputed that the children will not be returned to either of their parents’ permanent custody. We agree with the State that it sustained its burden of proving by clear and convincing evidence the ground for termination found under La. Child.Code art. 1015(5), which provides:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
Both the children in this case have been continuously in foster care since the fall of 1998. Neither parent substantially complied with his or her respective case plan. R.D.L. did not maintain the required contact with OCS and stopped all visitation with the children after six months. Additionally, R.D.L. stipulated that he would never be able to take care of the children due to his heart condition. C.R.B. missed meetings, including mental health appointments, did not take her medication as required, continued to maintain contact with a known child molester, and never fully acknowledged the reasons her children were taken into State custody. The trial court found that there was no reasonable expectation of significant improvement in C.R.B.’s mental condition or conduct in the near future, which finding is clearly supported by the expert testimony of Dr. Bux-ton and Dr. Bergeron.[3]
[ 9Pr. Buxton, an expert in clinical psychology, testified that C.R.B.’s inability to *87 act as a primary care-giver was due to a combination of factors — her mental disability, her cognitive limitations, her lack of education, and her dependent personality. He testified that, while there was no question that she loved her children, she was unable to provide a stable home for them and that the children would be at risk for neglect and abuse if returned to her care. Dr. Bergeron, an expert in family clinical pychology, similarly testified that C.R.B. was unable to function as a primary caregiver to the children because of her mild mental retardation and her bi-polar disorder. Both experts agreed that C.R.B. might be able to give some kind of limited secondary care to the children and that C.R.B.’s inability to act as a primary caregiver was through no fault of her own.
Thus, the State satisfied its burden of proving at least one ground for termination of parental rights by clear and convincing evidence, as there was no dispute that either parent would regain custody or be able to provide a stable home for the children. However, as discussed above, in order to terminate parental rights, the trial court is not only required to determine whether the State has proved a statutory ground for termination by clear and convincing evidence, but also to decide whether termination of parental rights is in the child’s best interest. See La. Child. Code art. 1037(A); State in the Interest of C.J.K. and K.K., supra; State in Interest of ML & PL, supra.

Trial Court’s Determination that Termination is not in the Children’s Best Interest

|inIn the instant case, the trial court determined that it was in the children’s best interest not to terminate the parental rights of either parent and to maintain the status quo, leaving the children indefinitely in their respective foster homes. The trial court’s determination was based on its findings that the children appear to be well-adjusted in their foster homes, that they presently are not in danger, that they appear to love their natural parents and their foster parents, that the parents should not be punished because of their respective disabilities, and that it was better for the children to maintain some semblance of family input in their lives through visitation with their parents and with each other than to face uncertain future adoption and the possibility of complete separation not only from their parents but from each other.
A. Termination of R.D.L.’s Parental Rights
It is well-settled that an appellate court cannot set aside a trial court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). First, we address the trial court’s findings with respect to the children’s father, R.D.L. The trial court determined that both of the children’s parents “are sincere, caring and good people who simply have respective mental and physical handicaps,” and that “[a]s long as they are willing to try and be secondary care givers to their children, they should be allowed to do so.” The trial court’s only specific finding with respect to the children’s feelings about their father was that G.J.L. wants to visit and maintain a relationship with his father, which finding is supported by the testimony of Michael Levinstone, the children’s social worker.[4] The only other *88 lutestimony regarding the children’s attachment to their father was Mr. Levin-stone’s statement that the children are “still connected” and “have a psychological attachment” to both their parents. Therefore, the court did not believe it was in the children’s best interest to terminate either parent’s rights. We disagree with this finding.
However, after reviewing the record, we find that the trial judge’s determination that it was not in the children’s best interest to terminate R.D.L.’s parental rights was clearly wrong and not reasonably supported by the evidence. In fact, the State was the only party that presented evidence at the termination hearing regarding R.D.L. The State demonstrated that R.D.L. no longer had any interaction with the children, that he had failed to visit them for over a year, that he did not substantially comply with his case plan, and that he was either unable or unwilling to care for the children because of his physical impairment. The State also pointed out that R.D.L. has never attended a family team conference or any court hearings regarding his children. R.D.L.’s attorney did nothing to rebut any of this evidence or explain R.D.L.’s conduct.
Furthermore, while the record contains a statement from R.D.L.’s doctor that his heart condition would prevent him from being the children’s primary care-giver, ln>at oral arguments before this court, R.D.L.’s attorney stated that he understood that R.D.L. and his present wife maintain a home together in which R.D.L.’s other children live. Again, when questioned by this court, R.D.L.’s attorney could offer no explanation as to how R.D.L.’s physical condition has prevented him from maintaining contact with the children or visiting with them in accordance with his case plan.
In addition, the State presented evidence regarding M.M.L.’s lack of a desire to see her father due to some alleged inappropriate behavior he exhibited towards her through the testimony of M.M.L.’s therapist, Michael Levinstone, and through the OCS case worker, Debra Faye Johnson. While the court of appeal made the factual finding that G.J.L. and M.M.L. love both their parents, it additionally noted that M.M.L. has at times expressed no desire to continue a relationship with her father.
Finally, at oral arguments before this court, it was not even clear that R.D.L. truly contests having his parental rights terminated; rather, his attorney suggested that R.D.L. would not simply give up his rights “as a matter of principle.” In conclusion, we agree with the State that, while it is clear that G.J.L. may want a relationship with his father, the record makes just as clear that R.D.L. cares little for his children and has made little or no effort to *89 comply with any portion of his case plan. Based on these facts, it was clearly wrong for the lower courts not to terminate R.D.L.’s parental rights. The State not only met its burden of proving by clear and convincing evidence the statutory ground for terminating R.D.L.’s parental rights, but also demonstrated that it was in M.M.L.’s and GJ.L.’s best interest to do so. The totality of the evidence concerning R.D.L.’s conduct and lack of concern for his children does not reasonably support the trial court’s determination not to terminate R.D.L.’s rights. Therefore, the court of appeal erred in affirming the trial court’s decision with respect to R.D.L. | ^Accordingly, we reverse that holding and order that R.D.L.’s parental rights be terminated as to both G.J.L. and M.M.L.
B. Termination of C.R.B.’s Parental Rights
The State sought termination of C.R.B.’s parental rights under La.Ch.Code art 1015(5). However, unlike R.D.L., C.R.B. strongly contest having her parental rights terminated. The evidence presented at trial clearly establishes that C.R.B. loves her children and the evidence is unequivocal that she is unable to care for her children as a result of her mental illness. This court recognizes that parents have a fundamental liberty interest to share a relationship with their children; however, such a right is not absolute especially when the parents’ behavior could jeopardize the health or safety of the child. See e.g. Wisconsin v. Yoder, 406 U.S. 205, 233-34, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1971); State in Interest of J.A., supra.
Testimony of various witnesses indicate that the children require and would function more effectively in a stable environment. The evidence also establishes that the children have been continuously subjected to the erratic behavior and exhibition of poor judgement by their mother. Dr. Alfred Buxton, Ph.D. examined C.R.B on two separate occasions. First in 1993 and a second time in 1997. After the 1993 examination, Dr. Buxton concluded that C.R.B. had a dependent personality and also a dysthymic disorder.[5] He determined that C.R.B. would require ongoing mental health intervention and noted that if the children remained in her care she would require supervision and the children would need in-home services. While Dr. Buxton could not testify as to the length of mental care required by C.R.B., he explained that the care would be long-term. Subsequently, in 1997, Dr. Buxton again had the occasion to examine C.R.B. Dr. Buxton testified that his impressions of C.R.B. |14changed. He dropped the dys-thymic disorder and characterized C.R.B’s condition as a bi-polar disorder. He believed that the mood disorder was more than dysthymia, and that her condition was moving towards one of the major affective disorders. Dr. Buxton testified that C.R.B.’s bad judgments and failure to make decisions for herself and her children could prove to be detrimental to the children’s welfare. He pointed out that at the age of seven G.J.L. was responsible for making extremely complex and mature decisions. He stated that C.R.B.’s cognitive limitations, through no fault of her own, precluded her from making the necessary judgments which parents are required to make to insure the well being of their children. Dr. Buxton conclusively opined, based on his evaluation of C.R.B, that C.R.B. could function only as a secondary care-giver to her children. In other *90 words, he believed that C.R.B. would need another competent primary care-giver present if she was going to have the children on a permanent basis.
Testimony was also elicited from Michael Levinstone, a board certified social worker and therapist. Mr. Levinstone testified that he has worked closely with the children for the past two years. He testified that C.R.B. possesses parenting deficiencies which he believes are directly related to her mental disabilities as well as prior sexual abuse and rejection issues which C.R.B. faced with her own mother. As to G.J.L., Mr. Levinstone stated that G.J.L. loves his mother very much and has taken on the role as her protector and cares very much for her well being. He pointed out that this protective role which G.J.L. has taken on has often created problems in C.R.B.’s household with her husband as G.J.L. often believes and behaves as though he is the father of the household. Mr. Levinstone testified that G.J.L. misses his mother but enjoys the bonds which he has established with his foster parents and his foster parents’ extended family. In fact, Mr. Levinstone stated that G.J.L. indicated that he L ¿wanted to be adopted by his foster parents or one of their daughters if he could not return to his mother’s care.
Mr. Levinstone seemed very concerned about M.M.L. He testified that she was very withdrawn while in C.R.B.’s home and stated that during his home visits he would notice how withdrawn M.M.L. appeared. He attributed her behavior to a host of factors including the allegations of physical and sexual abuse.[6] Mr. Levin-stone stated that M.M.L. would comment about missing her mother during the first year while she was in foster care but became more distant towards returning to her mother and was not committed to continuing contact with her brother, G.J.L. Mr. Levinstone often focused his visits with M.M.L. on the sexual abuse and feelings of anger that M.M.L. had towards her mother. He believed that M.M.L. felt as though her mother should have protected her and exhibited feelings of anger when her mother refused to believe the allegations.[7] Mr. Levinstone stated that M.M.L. is happy with her foster parents and often talks ..bout being adopted. While Mr. Levinstone believed it would be ideal for the children to be placed in an adoptive home together, he recognized that placement together was probably not feasible.
Dr. Ed Bergeron also testified. Dr. Bergeron evaluated C.R.B. in response to a request by the Office of Community Service. Specifically, Dr. Bergeron assessed C.R.B.’s psychological functioning as it relates to her parenting abilities. Based on the test performed, Dr. Bergeron concluded that C.R.B. is relatively limited on an | -i ¿intellectual level. As for her parenting abilities, C.R.B. was diagnosed as being at a high risk to engage in abusive behavior and/or more likely to provide an environment conducive for abuse and neglect. In addition, C.R.B.’s parenting profile indicated that she could not deal effectively with daily stress and was not able to meet the *91 daily requirements and demands of being a parent. Dr. Bergeron, after conducting all of the assessments, determined that it would be “very, very difficult” for C.R.B. to successfully parent her children.
At the conclusion of the hearing, the trial court recognized that C.R.B. will never be able to be a primary care giver to her children and refused to terminate C.R.B.’s parental rights on the basis that it is not in the best interest of the children to do so. The court decided that it is best to leave the children in their respective foster homes; continued to allow the children visitation and determined that he could revisit the situation at a later date. Moreover, the court was of the opinion that the best scenario was to allow the children to be adopted by the same parents. After careful review of the record, we believe the trial court erred in refusing to terminate C.R.B.’s parental rights.
As stated above, the best interest of the children is paramount. The experts and the lower courts all agree that C.R.B. can never provide a stable home for her children. While this court is cognizant that C.R.B.’s inability to care for her children is due to her mental illness and is of no fault of her own, we must examine very closely the needs of the children. As we stated in In Re: Interest of J.A., we are not creating a bright line rule that mental illness in and of itself should serve as a sole basis for terminating parental rights, but is it important to consider the parent’s mental state as it relates to the parent’s ability to care for their children. M.M.L. and G.J.L. are at a tender age, they require stability and should be afforded the ability to enjoy being children. The children have undergone emotional challenges while within the care of |17their mother. M.M.L. has been sexually assaulted and G.J.L. believes that he is responsible for the care of his mother. Clearly, the problems which these children have faced would challenge any well adjusted adult. As Dr. Bergeron testified, children are resilient and can overcome many disadvantages. However, in order to overcome such adversities, the children should be placed in a stable living environment which is free from turmoil. The record establishes that both children are doing well in their respective foster home and there is a strong likelihood that G.J.L. will be adopted by his foster parent. Although no specific request for adopting M.M.L. is in place, the expert testimony established that it would be in the best interest for both children to be in a position to be adopted. Therefore, based on the testimony and evidence, we find that the best interest of the children requires that the court terminate C.R.B’s parental rights as to both M.M.L. and G.J.L.

CONCLUSION

Based on the facts and evidence presented to this court, we conclude that it is in the best interest of the children to terminate the parental rights of C.R.B. and R.D.L. The State has satisfied its burden under La. Child. Code art. 1015(5) and this court finds it is in the best interest of the children to terminate C.R.B. and R.D.L.’s parental rights. Accordingly, we reverse the judgment of the court of appeal and remand the matter to the trial court for further expedited proceedings consistent with this opinion.
DECREE
JUDGMENT OF THE COURT OF APPEAL IS REVERSED; CASE REMANDED TO THE TRIAL COURT FOR EXPEDITIOUS TREATMENT.

 Retired Judge Philip C. Ciaccio, assigned as Associate Justice Pro Tempore, sitting for Associate Justice Harry T. Lemmon.

. The agency changed the location of the visitation after M.M.L. complained that her father exhibited inappropriate behavior towards her, such as excessive hugging and kissing, which made her uncomfortable.

. However, the Court additionally held that, while the clear and convincing standard is the minimum requirement that will satisfy due process principles, the determination of the *85 precise burden, equal to or greater than that standard, is a question of state law. Santosky, 455 U.S. at 769-70, 102 S.Ct. at 1403.

. As we noted in State in the Interest of J.A., 752 So.2d at 814, a finding that a parent suffers from a mental illness, standing alone, is insufficient grounds to warrant termination of parental rights. Rather, to terminate parental rights because of a mental disability, the condition must be related to the parenting ability. Id. Therefore, termination is only proper if the evidence is clear and convincing that there is no reasonable expectation of significant improvement in the parent’s condition in the near future, one of the statutory grounds for termination has been met, and the court determines that termination is in the best interest of the child. Id. (citing La. Child. Code art. 1015(5)).

. At the hearing, Michael Levinstone, the children’s social worker, Dr. Bergeron, a psychologist who had evaluated M.M.L. once, and, Debra Faye Johnson, the foster care worker, *88 testified as to the children's feelings concerning their parents and their respective situations in foster care. Additionally, the trial judge interviewed the children in chambers in the presence of the attorneys; however, that interview was not placed on the record. We note that as a general rule, any in camera interviews of a minor must be conducted with a court reporter present and a record made of the questioning and answers. See, e.g., Nail v. Clavier, 99-588 (La.App. 3 Cir. 11/10/99), 745 So.2d 1221, 1225; In re Custody of Landry, 95-0141 (La.App. 1 Cir. 10/6/95), 662 So.2d 169, 173; Osborne v. McCoy, 485 So.2d 150 (La.App. 2 Cir. 1986), writ denied, 488 So.2d 1027 (La.1986); Watermeier v. Watermeier, 462 So.2d 1272 (La.App. 5 Cir.1985), writ denied, 464 So.2d 301 (La.1985). However, the failure to transcribe the trial judge’s interview of the children in the present case does not constitute reversible error as the trial judge's factual findings regarding the children's feelings and preferences are supported by other evidence in the record, namely the testimony of Mr. Levinstone.

. Dysthymic disorder is defined as a disorder with a chronic depressed mood; it is a very mild form of depression.

. According to the record, there were allegations that M.M.L. was physically abused by G.J.L. Mr. Levinstone testified that G.J.L. would often yell at M.M.L. during his home visits and stated that M.M.L. recounted an incident when G.J.L. touched her inappropriately. Additional evidence existed that M.M.L. was the victim of sexual misconduct by C.R.B.’s husband's brother.

. Mr. Levinstone testified regarding a visit between C.R.B. and M.M.L. when C.R.B. mentioned the name of M.M.L.'s sexual abuser and stated that he said to tell her ‘'hello.” Mr. Levinstone recalls that M.M.L. became furious and he noticed a definite change in behavior during the visit.