799 So.2d 1178 (2001)
STATE of Louisiana, in the Interest of MRH, Plaintiff-Appellee,
v.
BF and JRH, Defendants-Appellants.
No. 35,588-JAC.
Court of Appeal of Louisiana, Second Circuit.
October 31, 2001.
*1179 James Mark Stephens, Counsel Winnsboro, for Appellant, B.F.
Susan Skidmore, Monroe, Counsel for Appellee.
Donnie Ellerman, Winnsboro, Counsel for M.R.H.
Samuel Talmadge Singer, Winnsboro, Counsel for J.R.H.
Before GASKINS, KOSTELKA and DREW, JJ.
DREW, J.
From the judgment terminating the parental rights of both parents and freeing the child for adoption, the mother has appealed. It is undisputed that the mentally impaired mother "is not now nor will ever be capable of caring for her child, without assistance." However, the mother opposes the termination of her parental rights and seeks to remain a part of the child's life so that she can develop a strong emotional bond with the child, to the benefit of both. For the following reasons, the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND
The baby girl, MRH, was born November 26, 1999. When hospital personnel observed the mother attempting to feed the newborn with adult food, they called Office of Community Services (OCS) which obtained an Instanter Order and placed the child in the custody of the state. At a custody hearing on December 3, 1999, the child was continued in the state's custody. On December 29, 1999, the state filed a petition to have the infant adjudicated a child in need of care. At the January 29, 2000 hearing, the trial court ordered (1) the agency to provide services to the biological parents, (2) both parents to be psychologically tested and (3) the child to remain in the custody of OCS.
A review hearing was conducted on April 26, 2000. On May 5, 2000, OCS filed a "Child in Need of Care Judgment of Adjudication And/or Disposition Pursuant to Articles 666, 681, 684 of the La. Children's Code." The trial court signed a judgment ordering the child to remain in the custody of OCS and denying the state's request for a Premature Petition for Termination. At the October 25, 2000 permanency hearing, the trial court concluded the best interest of the child was that she remain in custody of OCS with a permanent plan goal of adoption.
On January 21, 2001, the state filed a Petition to Terminate the Parental Rights of the mother and the father. At the March 23 hearing, the parties stipulated to the introduction of the entire record in these proceedings and to the introduction of the psychological reports on both parents. After hearing testimony, the trial court took the matter under advisement to consider the psychological reports and other evidence. Thereafter, the trial court found that the state was entitled to termination of the parents' rights. The judgment revoked their parental rights, ordered that the parents be informed of the Voluntary Registry Law under La. Ch. C. art. 1270 et seq., and directed that the state inform the court about potential adoption placements. The child was declared free and eligible for adoption and ordered to remain in the state's custody.

REASONS FOR JUDGMENT
In extensive Reasons for Judgment, the trial court noted that both parents love MPH very much, but that the issue was *1180 whether they were capable of providing for the child's needs and rearing her.
OCS attempted to provide services to the parents and referred them to Family Ties affiliated with ULM. For about six months, the parents received services including transportation, home visits, individualized parenting instruction, Father's Support Group, Parent Effectiveness Training and parenting workshop. Both parents attended most of their sessions but their participation was limited due to their mental capabilities. On October 18, 2000, both had scratches on their faces and necks; they admitted they had been fighting with one another. Based upon his twenty years experience working with developmentally impaired persons, the Family Ties director concluded neither parent was capable of acquiring the parenting skills necessary to rear a child or to provide safety, permanency, or proper care. His opinion was that the parents were vulnerable, dependent and immature.
The psychological tests on both parents showed the mother had a full scale IQ of 61, the mild mentally handicapped range. The psychologist found that the mother was not likely to make significant improvement intellectually or emotionally. The determination was that the mother was not able to meet the child's basic needs and the child would be at risk of abuse due to the mother's lack of understanding of child care. The father had a full scale IQ of 60. The result was that the parents could only marginally care for themselves with the assistance of others and that they were unable to care for a child. The trial court observed that both parents were taking anti-psychotic drugs.
The child has special needs including asthma, respiratory problems and physical therapy for developmental delay. Further, no relative was willing to undertake assistance to either parent in caring for the child.
The father was on parole for simple burglary and had some misdemeanor arrests and a couple of positive cocaine screenings while on parole. If he missed a substance abuse meeting or had another positive drug screen, his parole would be revoked, according to his parole officer.
The mother had problems with anger management and frequently called OCS with complaints that someone caused her problems. The mother had difficulty getting along with people and moved several times since MRH's birth. In the months before trial, she lived in the homes of Gertha Mitchell and Jimmie Lee Jones where she was unhappy and attempted to leave. She requested placement in a group home where she stayed a week. On January 12, 2001, the mother made a domestic violence complaint against the father and asserted he attempted to prostitute her. Before trial she was arrested on complaint of Ms. Jones for disturbing the peace on March 15, 2001. When she got out of jail, she returned to Ms. Jones' home. At trial both parents were living with Ms. Jones who stated they were unable to care for the child on their own, but that she would be willing to help them with the baby. Ms. Jones also stated that periodically the mother refuses to take her medicine and becomes hostile, so that Ms. Jones has to call the police. Aged 64, Ms. Jones testified she had an open door policy and has other relatives in her home.
Notwithstanding Ms. Jones' willingness to help, the trial court concluded the safety and welfare of the child would be in jeopardy due to the volatile relationship between the mother and father. The trial court found that the state proved by clear and convincing evidence the grounds in La. Ch. C. art. 1015(5) for termination of parental rights:
Unless sooner permitted by the court, at least one year has elapsed since a *1181 child was removed from the parent's custody pursuant to a court order, there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
Under La. Ch. C. art. 1037, the trial court stated that termination of parental rights is mandatory unless the court found termination was not in the child's best interests. No evidence indicated that it was in the child's best interests to deny termination.

DISCUSSION
Only the mother appealed the judgment terminating the parents' parental rights. Therefore, only issues pertaining to the mother will be addressed. While admitting she would never be able to provide independent care for her daughter, the mother argued that she should be permitted to maintain contact with the child for the benefit of both.
Mental illness in and of itself is not a sole basis for termination of parental rights. However, the parent's mental state is an important factor as it relates to the parent's ability to care for her child. State in the Interest of G.J.L., XXXX-XXXX (La.6/29/2001), 791 So.2d 80. In G.J.L., the supreme court noted the undisputed fact that the children would not be returned to either parent's permanent custody. The mother, who clearly loved her children, suffered from bi-polar disorder and mild mental retardation. The father was physically infirm and had demonstrated limited interest in the children. The supreme court terminated the parental rights of the parents on finding that the state had sustained its burden of proving by clear and convincing evidence the ground for termination under La. Ch. C. art. 1015(5) and that termination of the parents' rights was in the children's best interests.
[I]n termination proceedings, courts must carefully balance the two private interests of the child and the parents. While the parents have a natural, fundamental liberty interest in the continuing companionship, care, custody and management of their children, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, longterm, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent.
The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.

*1182 This court has always recognized, however, that great care and caution must be exercised in these proceedings, because the permanent termination of the legal relationship existing between children and their biological parents is one of the most severe and drastic actions the State can take against its citizens. Parents have a natural, fundamental liberty interest in the continuing companionship, care, custody and management of their children, which warrants great deference and vigilant protection under the law. Thus, we recognize that the potential loss to parents is grievous, "perhaps more so than the loss of personal freedom caused by incarceration." Because due process requires that a fundamentally fair procedure be followed when the State seeks to terminate the parent-child legal relationship, actions to terminate must be scrutinized very carefully.
Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. Article 1015 provides the specific statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. In order to terminate rights, the court must find that the State has established at least one of those statutory grounds by clear and convincing evidence. Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interest. (Citations omitted.)

State in the Interest of G.J.L., at pp. 85-86. See also State in the Interest of J.A., 99-2905 (La.1/12/00), 752 So.2d 806.
Thus, the termination of parental rights must be based upon a two-fold inquiry. First, has the state proven by clear and convincing evidence a statutory ground for termination? Second, is the termination in the child's best interests?
In this unfortunate and sad dispute, the trial court correctly determined that the state sustained its burden of proving by clear and convincing evidence that the mother had not complied substantially with the case plan designed to reunite her with her child. Further, no reasonable expectation existed for significant improvement in the mother's condition in light of the child's age and need for a safe, stable and permanent home.
The OCS case worker testified there had been three separate case plans during this child's life. Initially, the plan was to reunite the child and her parents. The mother and father received a variety of services to assist them in preparing to care for their child. The services were not successful and were ultimately discontinued.
The mother did not maintain adequate, stable housing. Since the child's birth, the mother lived for a time with Linda Washington but left when that did not work out. She lived with her own mother, Gertha Mitchell, but could not get along with the maternal grandmother. The mother lived with a number of different relatives in both Winnsboro and Monroe. In July 2000 she was hospitalized for several days due to mental and behavioral problems. A maternal aunt in Baton Rouge promised to take the mother but never arrived. The mother also stayed in a group home for about a week but left there. At trial she and the father were staying with Jimmie Lee Jones who was payee for the father's assistance check and assisted the couple with their needs.
The OCS case worker stated that the mother had failed to meet another goal of the case plan; i.e., to learn to budget and manage her money. The witness described attempting to counsel the mother *1183 about budgeting her funds without success. The mother ran out of money before time to get her next check and on a number of occasions appeared to put her own needs ahead of her child's by buying something new for herself, but having nothing for her child at visits. While she did bring clothing or diapers for the baby to some visits, those items were on some occasions the wrong size or otherwise inappropriate for the child.
Under the case plans, the mother was to take her medication as ordered by her doctor. The case worker testified that the mother refused her psychiatric medication one month and had to be coaxed into agreeing to take the medicine.
The mother was not successful in managing her anger and there was evidence of domestic violence. The mother had difficulty getting along with people and frequently called OCS workers with complaints about other persons. The week before court the mother was jailed due to complaints about her behavior by Ms. Jones with whom she resided. On one occasion both parents appeared for parenting classes with scratched faces and admitted fighting with one another.
The mother's failure to meet the goals set out in the case plan was not due to lack of interest or effort on her part to meet the goals set out for her. The stipulated psychological reports showed the mother to be unable, due to her mental condition, to care for herself independently. She did not have sufficient ability to learn the necessary parenting skills and would never be able to provide a permanent, stable home for herself and her child.
The psychologist who examined the mother found her to be mildly mentally handicapped with significant deficits in adaptive behavior and severely impaired verbal communication skills. The fact that she took anti-psychotic medication indicated she had major psychiatric disturbance. The psychologist concluded she cared for her child but did not have sufficient intellectual, adaptive or emotional functioning sufficient to meet a child's basic needs. Therefore, the child would be at risk due to her lack of understanding of child care and her inability to acquire the necessary skills.
This record establishes that terminating the parental rights of MRH was in the child's best interests. Even though the parents have a fundamental liberty interest in having a relationship with their child, that right is not absolute, especially when the parents' behavior could jeopardize the health or safety of the child. State in the Interest of G.J.L., supra.
Testimony established that the child had health and developmental problems that would require special attention and care. The mother's mental handicap is further complicated by her demonstrated difficulty in managing her anger and inability to get along with others, including the father of the child and the woman with whom she lived at trial, Ms. Jones. Everyone, including the mother agreed that she would never be able to care for her child independently.
The agency tried alternate relative placement for the child unsuccessfully. Declining to permit a home study, the maternal grandmother refused to make her home available to the infant because she had a mentally and physically impaired son living there. In May 2000 an agency home study determined Jimmie Lee Jones' home to be unacceptable for placing the infant. The OCS worker testified there was not room in the home and the agency had concerns about Ms. Jones' commitment to the child. Ms. Jones stated she would not adopt the child because she did not want the child to be able to inherit from her to the detriment of her own children. The OCS worker testified that *1184 the agency found no satisfactory relative or friend who was willing to assist the parents with this child on a permanent basis and no volunteer came forward.
While Ms. Jones indicated a willingness to have the child in her home and to assist the parents with child care, she was unwilling to consider adopting the child. Ms. Jones testified she had known the mother since she was a child and loved her. She had assisted in caring for the mother for a long period of time. Ms. Jones acknowledged that at times, when the mother could not get her way and became angry, she said things including accusing Ms. Jones of misusing her money. The week before the trial, Ms. Jones had the mother arrested for being angry and out of control. On cross examination, Ms. Jones stated that when the mother became angry she would leave Ms. Jones' home and be gone a couple of days. The witness admitted the mother could not care for the child on her own.
Pointing to La. Ch. C. art. 1036, the state observed that mental deficiency is not a defense to termination of parental rights. In pertinent part, the article states:
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
Clearly the mother is unable to care for her child through no fault of her own. While the mother loves her child and seeks to continue a relationship with her, the child's interest in having stability and proper care is paramount. The OCS worker testified that the child's foster mother had experience with developmentally delayed children, had adopted other children, one of whom had physical handicaps, and had indicated a desire to adopt the child. The only offered resource for the mother was that of Ms. Jones. However, the testimony established that home was not a stable, secure setting due to the mother's multiple problems.
Based upon the facts and evidence, it is in the best interest of MRH to terminate the rights of her parents. Further, the State proved by clear and convincing evidence that the parents did not make substantial compliance with the case plan. La. Ch. C. Art. 1015(5). Therefore, the judgment of the trial court is affirmed.

DECREE
The judgment of the trial court is AFFIRMED.