811 So.2d 198 (2002)
STATE of Louisiana in the Interest of D.S.C., S.W.C. and J.S.W.,
v.
J.C.R., M.H.W. and A.R.S.
No. 35,893-JAC.
Court of Appeal of Louisiana, Second Circuit.
February 27, 2002.
*199 W. Allen Haynes, for Appellant, JSW.
Margherita McWilliams, Mary Ellen Halterman, Shreveport, for Appellant, JCR.
Pamela Harper-Jacob, Assistant District Attorney, for Appellee.
Wilbert Pryor, Shreveport, for D.S.C. and S.W.C.
Peter Black, Shreveport, for M.H.W. and A.R.S.
Before BROWN, GASKINS and KOSTELKA, JJ.
BROWN, Judge.
J.C.R. is the mother of four children: one daughter, T.C., who is not involved in the instant termination proceedings, and three sons, J.S.W., born on November 4, 1990, and twins, D.S.C. and S.W.C., born on May 27, 1992. The State of Louisiana, Department of Social Services, Office of Community Services (hereinafter "the State"), first became involved with this family in Ouachita Parish, Louisiana, on June 9, 1993. The State received a report that J.S.W., who at the time was 2½ years old, was found by himself on the railroad tracks at Hwy. 165 in Monroe, Louisiana. There were also several complaints about the condition of the mother's home. The State investigated and validated the complaints and, rather than removing the child, offered and provided family services to the mother in her home.
Thereafter, without notice to her case manager, the mother and her children left the Monroe area and moved to Shreveport. Three months later, on September 14, 1993, the State received a report of physical abuse involving D.S.C., who was at that time 16 months old. According to the complaint, D.S.C. was allegedly found by his 17-year-old babysitter (who was the mother's boyfriend) floating in a bathtub in the babysitter's home. D.S.C. was taken to LSUMC where he was admitted to the pediatric intensive care unit.
Dr. Ann Springer, a pediatrician and expert in the field of child abuse, reviewed *200 D.S.C.'s medical records and testified that his CT scan revealed "what was described as a huge subdural hematoma on the left with a massive midline shift, an obliteration of the left ventricle, massive edema, probably left cerebral hemispheric infarct." In other words, D.S.C. had bleeding in his brain below the skull or tough outer coating. There was so much swelling that the toddler's brain had been pushed to the left by blood accumulation and swelling and the left ventricle which should have had space for brain growth was obliterated.
D.S.C. was diagnosed with "Shaken Baby Syndrome." He had rib fractures as well as some fractures of his extremities which were estimated to be three weeks old based upon the formation of new bone. The bleeding in the brain was acute and most likely occurred within a few hours before the baby's transport to LSUMC. Extensive retinal hemorrhages were noted in an opthalmology consult. D.S.C. also had multiple bruises of differing ages, adult sized bite marks, an unexplained burn and numerous adult handprint marks on his chest.
Regarding his alleged drowning, EMS workers noted that, upon their arrival, the toddler was lying on the couch in dry, not wet, clothes. Furthermore, there was no water in his lungs, nor did he subsequently contract pneumonia, a common development when a child gets dirty bath water in his lungs.
After a 15-day stay in LSUMC, D.S.C. was transported to New Orleans for extensive rehabilitation for his right side paresis and treatment for his significant eye injuries. As a result of the trauma inflicted upon him by his teenaged babysitter, D.S.C. has permanent, residual, disabling injuries.
Dr. Springer examined D.S.C.'s three siblings and found that his sister, T.C., had head lice and evidence of sexual abuse in the form of a tear in her hymenal opening.[1] Dr. Springer noted multiple scratches and abrasions on S.W.C. and J.S.W. and one of the boys had infected skin lesions or impetigo on his buttocks. J.S.W. had numerous rotten teeth, four of which were decayed to the nerves. None of the children were current on their immunizations.
Based upon the above and the mother's passive response to the abuse,[2] as well as her refusal to keep the perpetrator out of her home, on September 16, 1993, the State obtained an instanter order which removed the children from their mother's custody and placed them in the temporary custody of the State. On January 11, 1994, all four children were adjudicated children in need of care under La. Ch.C. art. 606 and placed in foster care.
That same month, the mother moved to Jonesboro, Louisiana, to live with her mother. In February, her case was transferred from Caddo to Lincoln Parish and Allyson Lensing was assigned as the case manager. The initial case plan goal was reunification and the mother was required to meet a number of requirements toward that end.[3]
*201 Ms. Lensing visited the mother at her home and offered advice as to how to bring her house up to standard. Additionally, the mother attended parenting classes and individual therapy sessions and received intensive home-based services. The therapist, Rick Wheat, recommended a trial placement of T.C., who was returned to her mother on March 6, 1995. Thereafter, J.S.W. returned home on April 25, 1995.
J.S.W. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and was difficult to control. He and his sister, T.C., fought constantly, often violently, and Ms. Lensing noted that their mother lacked the authority or assertiveness to effectively manage the children.
Ms. Lensing noted on her home visits that the house was filthy, even when the mother knew that the social worker was coming for a visit; large animals who were allowed to wander in and out of the house at will often left behind excrement, and the home was infested with roaches. To assist the mother in improving her living conditions, the intensive home-based services, which included assistance in homemaking skills, finance, discipline and parenting techniques, were continued.
The mother was forced to find other living arrangements. Ms. Lensing helped her secure Section Eight housing, but by the time the home was available, she had moved to a dilapidated trailer in Leesville, Louisiana.
Thereafter, her case was transferred to the Vernon Parish office and Ila Cook was named the case manager. Ms. Cook began *202 working with the mother in February 1996 after receiving a report that T.C. had extensive bruises on her legs and that the family had inadequate shelter. The children were removed from the mother's home at that time. It was later learned that T.C.'s bruises were caused by a rare bleeding disorder, Idiopathis Thrombocytopenic Purpura ("ITP"). The inadequate housing report, however, was validated. Ms. Cook noted that the mobile home had broken windows and trash and bits of glass on the floors.
The mother's case plan required her to obtain housing, attend a parenting group and participate in counseling and therapy. Section Eight housing was obtained and Terri Theaux, who was working with the mother, recommended that T.C. and J.S.W. be returned to the home on a trial basis. This was effected on November 20, 1996.
The mother had difficulty managing the behavior of both children, especially that of J.S.W. The medication given to J.S.W. to control his ADHD, Ritalin, had been discontinued.[4] Ms. Cook and the mother took J.S.W. to a physician for a medication evaluation. J.S.W. became uncontrollable at the doctor's office and caused extensive damage to the examining room. J.S.W. was subsequently hospitalized at a mental health facility for most of 1997.
The mother got married in June 1997. T.C. remained in her custody and she continued to work toward reunification with her other children, attending parenting classes and mental health therapy and visiting regularly with the twins. J.S.W. was discharged from the psychiatric residential facility in December 1997. Feeling that J.S.W. needed a more constructive home life, and noting that T.C. was a serious behavior problem in the home, Ms. Cook recommended that J.S.W. either be placed in a therapeutic foster home or returned to the Johnson family, the foster family to whom he had become attached.[5] Ms. Theaux was concerned that the second failed placement with the mother had put J.S.W. "over the edge," and caused him to be extremely vulnerable and fragile. She also described J.S.W. as being significantly detached from his sister T.C. and poorly bonded with his mother. Ms. Theaux felt that J.S.W.'s only healthy attachment was with his twin brothers, D.S.C. and S.W.C.
The mother and T.C. moved to Texas in June 1998 to live with her mother and because her husband had a job there.[6] The case was transferred from Vernon Parish back to the Caddo Parish office and Cathy Williams was assigned as case manager.[7] While the mother and T.C. were in Texas, the State's plan for the children changed and placement with relatives became the goal. A home study, however, resulted in rejection of such placement. Prior to her move to Texas, the mother sought mental health treatment in Leesville, but discontinued taking the anti-depressant medication prescribed by the clinic. Thereafter, she allegedly obtained an assessment from a local public mental health facility in Texas and was told that she was not a candidate for their services.
*203 Because the plan for placement with relatives was unworkable, the mother, her husband and T.C. returned to Louisiana in November 1999 in an effort to complete the requirements of her case plan and work towards reunification. They rented a three bedroom house in Bossier City and her husband obtained local employment.
The State, however, filed a petition for the involuntary termination of parental rights as to D.S.C., S.W.C. and J.S.W. on October 14, 1999. The State sought to terminate not only the mother's parental rights (under La.Ch.C. art. 1015(5)), but those of the father of D.S.C. and S.W.C. (under La.Ch.C. art. 1014(4)(b) and (c)), and the father of J.S.W. (under La.Ch.C. art. 1015(4)(b)). During the pendency of this action, the mother continued participating in therapy with her son, D.S.C., visiting with her children and working with the State towards reunification.
The termination hearing began on February 8, 2001. The following day, the mother stipulated to the termination of her parental rights as to the twins, D.S.C. and S.W.C., pursuant to La.Ch.C. art 1025.2. The twins' attorney moved for continued contact with the mother pursuant to La. Ch.C. art. 1037.1. The motion was granted and judgment to that effect was signed on April 12, 2001.[8]
Trial continued and at the end of the evidence, the trial court found that the State had proved the ground for termination of the mother's parental rights, La. Ch.C. art. 1015(5), by clear and convincing evidence. Specifically, the court found that:
There have been several reuniting episodes with the mother in the home that have not been successful. There is no reasonable prospect that these conditions are going to change in the future. For that reason I think it is in the best interest of [J.S.W.] that his parental rights with his mother be terminated.
A judgment terminating the mother's parental rights was signed on August 21, 2001.[9] Thereafter, on August 28, 2001, the mother filed a motion for new trial as to all three children, contending that the judgment was contrary to the law and the evidence. The trial court denied the motion on October 1, 2001, finding that the mother had stipulated to the termination of her rights vis-a-vis the twins and that the State had met its burden of proof regarding J.S.W. The court further found that it was in the best interest of J.S.W. to terminate the mother's parental rights. Both the mother and J.S.W. have appealed.[10]

Discussion
The State's parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. State in the Interest of J.A., 99-2905 (La.01/12/00), 752 So.2d 806. "The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional and mental health needs and adequate rearing by providing an expeditious judicial process *204 for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child." State in the Interest of C.J.K. and K.K., 00-2375 (La.11/28/00), 774 So.2d 107, quoting State in the Interest of J.A., supra at 811.
As recognized by the Supreme Court in Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982), "the fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents." A related principle is that in an involuntary termination of parental rights proceeding, a court must delicately balance the natural parent's fundamental right and the child's right to a permanent home. State in the Interest of S.N.W., C.J.W., C.L.M., C.N.M., J.A.M. & I.M.M. v. Mitchell, 01-2128 (La.11/28/01), 800 So.2d 809.
In compliance with the Adoption and Safe Families Act ("ASFA"), 42 U.S.C. § 601, et seq., passed by Congress in 1997, our legislature amended several of the provisions relating to termination, including La.Ch.C. art. 601, which was changed to provide that "[t]he health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title." La.Ch.C. art. 601, Official Comment (c).
Therefore, recent jurisprudence has recognized that "the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable statutory grounds exist and are proven." State in the Interest of S.N.W., supra, quoting State in the Interest of S.M.W., C.D.W., C.N.W. and E.S.W., 00-3277 (La.02/21/01), 781 So.2d 1223, 1238.
To assist the court in determining whether a parent is unwilling or unable to adequately care for a child's physical, emotional and mental health needs, La. Ch.C. art. 1015 sets forth seven statutory grounds for the involuntary termination of parental rights. State in the Interest of C.J.K., supra. In order to sever a parental bond, the state must prove the statutory ground for termination by clear and convincing evidence. Santosky, supra; La.Ch.C. art. 1035(A). Although only one ground need be established, the trial court must also find that termination is in the child's best interest. La.Ch.C. arts. 1015, 1037(A); State in the Interest of G.J.L. and M.M.L., 00-3278 (La.06/29/01), 791 So.2d 80; State in the Interest of M.L. and P.L., 95-0045 (La.09/05/95), 660 So.2d 830. The trial court's findings on factually intense termination issues are governed by the manifest error standard of review. State in the Interest of S.N.W., supra; State in the Interest of S.M.W., supra.
Turning now to the issues presented in this case, the specific statutory ground on which the State relies for termination of the mother's rights is La.Ch.C. art. 1015(5), which sets forth a three-pronged requirement for termination. Article 1015(5) provides:
(i) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order;
(ii) There has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child;
(iii) Despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering *205 the child's age and his need for a safe, stable and permanent home.
The first prong, the lapse of a year, is not disputed. In fact, J.S.W. has been out of the home, with the exception of two failed trial placements, for more than six years. What is contested, however, are the second prong, lack of substantial parental compliance with a court-ordered case plan, and the third prong, lack of a reasonable expectation of significant improvement in the near future. As noted above, a trial court's factual determinations, including whether a parent is unfit and whether there is a reasonable expectation of reformation, will not be set aside in the absence of manifest error. State in the Interest of F.H. v. House, 35,451 (La.App.2d Cir.10/02/01), 801 So.2d 1123; State in the Interest of D.T. v. K.T., 29,796 (La.App.2d Cir.06/18/97), 697 So.2d 665.
La.Ch.C. art. 1036(C) enumerates the substantive elements proving lack of substantial compliance with a court-approved case plan. This prong may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
(2) The parent's failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification. (Emphasis added).
Likewise, the substantive elements proving lack of a reasonable expectation of significant improvement in the near future are set forth in La.Ch.C. art. 1036(D), which provides that this third prong may be shown by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior. (Emphasis added).
Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens. As noted previously, however, the primary concern of the courts and the State remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. State in the Interest of S.M.W., supra.
In the instant proceeding, the State proved by clear and convincing evidence the grounds for termination under La. *206 Ch.C. art. 1015(5) and that termination was in the best interest of J.S.W. These factual findings have ample support in the record and are reasonable in light of the record in its entirety. Thus, they are neither clearly wrong nor manifestly erroneous.
The record shows that the mother loves her son and that she did make improvement in several areas that were critical to her case plan. A mother's affection and provision of a home, however, is not enough when that parent is unable or unwilling to provide adequate care for her children's physical, emotional and mental health needs.
Even after counseling, group therapy, parenting classes, extensive in-home services and two trial placements of J.S.W. (both of which failed, the second one resulting in his one-year stay at a juvenile residential psychiatric facility in New Orleans), the mother has not acquired sufficient parenting skills needed to care for her special needs son.
The mother was diagnosed with a mixed personality disorder with dependent and antisocial features and needs continuous therapy and treatment in order to improve. The record is clear that, while the mother did participate in some counseling and therapy, she did not take the anti-depressant medication she was prescribed and thereafter ceased her mental health counseling and therapy. As noted by this court in State in the Interest of M.R.H. v. B.F. and J.R.H., 35,588 (La. App.2d Cir.10/31/01), 799 So.2d 1178, 1181, mental illness in and of itself is not a sole basis for termination of parental rights. A parent's mental state is, however, an important factor as it relates to the parent's ability to care for her child. Id.; State in the Interest of G.J.L., supra.
As noted above, J.S.W. was returned to his mother twice, with seemingly tragic results. J.S.W. has episodes of complete withdrawal, selective mutism and anger tantrums of almost unbelievable severity. It was following one such extreme tantrum while in his mother's care that J.S.W. was placed in a psychiatric facility for observation and therapy.
J.S.W.'s therapist testified unequivocally that J.S.W. would, for all intents and purposes, be lost if he were to be returned to his mother and suffer through a third failed placement. Furthermore, not one therapist, counselor, social worker or case manager thought that J.S.W. should be returned to his mother and take the risk of a third traumatic and unsuccessful placement. Instead, it was recommended by his treating psychologist at the psychiatric facility in which he resided for a year that J.S.W. needed to be in a structured residential setting with one-on-one attention to help him learn to control his aggressive and delinquent type behavior.
The mother has custody of her daughter, T.C., who, like her brother, J.S.W., has severe behavior problems which require structure, routine and very close supervision. During the two trial placements, J.S.W. and T.C. fought incessantly and were very violent with each other and their mother. As noted by one of the case workers, the mother is a passive person who has great difficulty recognizing and meeting the identified needs of her children. Furthermore, she continues to minimize the effects of the abuse and neglect that her children have suffered.
As noted by the supreme court in State in the Interest of S.M.W., supra at 1238, there comes a point when the best interests of the child must be served by terminating parental rights in order to achieve permanency and stability for that child. Notwithstanding its decision to terminate *207 the mother's parental rights, the trial court has allowed for continued contact between the mother and J.S.W. We will uphold the trial court's judgment in its entirety to allow for such visitation.

Conclusion
For the reasons set forth above, the judgment of the trial court is AFFIRMED.
NOTES
[1] The child also tested positive for chlamydia. The mother related to one of the case workers that once she learned that T.C. had been sexually abused by her [the child's] father, she kicked him out of their home.
[2] There is no evidence in the record to indicate that the mother was directly responsible for any of the abuse suffered by her children. Instead, the alleged perpetrator was her babysitter/boyfriend.
[3] The case plan included the following requirements:

(1) Visit the children in accordance with the visitation contract.
(2) Be available for twice monthly visits from the Department's worker to discuss progress and problems.
(3) Be supportive of the children's placement while working towards reunification.
(4) Attend parenting skill classes and provide documentation of their attendance and demonstrate improved parenting skills.
(5) Demonstrate that [she] can provide the children with a home where they have adequate space, affording the children privacy and clean safe living conditions.
(6) [J.C.R.] will take whatever measures are necessary in order to have a clean home free of pests and lice.
(7) [J.C.R.] will participate in occupational and physical therapy with [D.S.C.].
(8) [She] will continue to involve [herself] in individual therapy to resolve [her] own feelings about [her] life experiences and the abuse the children have suffered. [She] will involve [herself] in family therapy with the children when this is recommended by therapist for [her] and the children.
(9) [She] will involve [herself] in therapy with [T.C.] and her therapist when recommended to deal with the issues surrounding the sexual abuse [T.C.] experienced.
(10) [J.C.R.] will have sufficient income and resources to meet the needs of herself and the children.
(11) [J.C.R.] will provide the Department with the names and addresses of all relatives in order to assess interest in and ability to provide homes for the children.
(12) [J.C.R.] will avail herself of assertiveness training in order to improve her self esteem and learn to depend upon herself. She will consider vocational opportunities in order to improve her skills for possible employment possibilities.
(13) [J.C.R.] will submit to a psychological evaluation to determine her intellectual, emotional/mental state and the need for therapy and follow treatment recommendation.
* * *
(15) [J.C.R.] will not permit other persons, not even family, to stay overnight in their home with the exception of [the grandmother's] minor daughter ... and her baby.
(16) [J.C.R.] will follow recommendations of treatment and medication through Mental Health Clinic.
(17) [J.C.R.] will inform the Department of any lifestyle and address changes.
(18) [J.C.R.] will become more knowledgeable and involved in the treatment of her special needs child, [D.S.C.], by attending appointments, therapy and counseling.
(19) [She] will sign releases to information.
(20) [She] will admit [her] responsibility in the abuse and neglect of the children.
(21) Develop a schedule for housekeeping to provide a safe, clean home with working utilities.
[4] According to the State, it was the mother who stopped J.S.W.'s medication. However, she contended that J.S.W.'s foster mother discontinued the Ritalin.
[5] Ms. Cook tried to help the mother with T.C., who was misbehaving in and refusing to attend school. T.C. was evaluated and diagnosed with Oppositional Defiant Disorder.
[6] The State obtained the court's approval in June 1998 for the return of full custody of T.C. to the mother.
[7] Ms. Williams served as case manager from April 1999 to March 2001.
[8] The trial court also rendered judgment terminating the parental rights of the father of the twins.
[9] The parental rights of J.S.W.'s father were also terminated.
[10] Although J.S.W. assigned as error the termination of his father's rights, the father in brief conceded the propriety of the trial court's action.