WILLIAMS, J.
hThe Louisiana Department of Children and Family Services (“the Department”) appeals the juvenile court’s ruling that the Department failed to meet its burden of proving the grounds for termination of the parental rights of F.B., the father of L.M. For the following reasons, we reverse and render.
FACTS
V.M. (“the mother”) is the mother of L.D., born October 22, 2003, and L.M., born April 13, 2006. On March 18, 2008, the Department received a report that the mother, who had a long history of drug use, had left the children in the care of her sister, and the sister was no longer willing and/or able to care for them. The report was investigated, and no known suitable relatives were located to care for the children at that time.
On March 28, 2008, the Department requested and obtained an Instanter Order to remove L.D. and L.M. from the custody of the mother and place them in the custody of the Department. In the affidavit in support of the Order, T.D. was alleged to *456 be the father of L.D., and R.S. was alleged to be the father of L.M. However, a DNA test verified that R.S. was not L.M.’s biological father.
On July 8, 2008, L.D. and L.M. were adjudicated children in need of care and continued in the custody of the Department. Pursuant to case plans formulated by the Department, the primary goal was reunification of the children with the mother. The secondary goal was to grant guardianship of the children to a suitable relative. Initially, the children were placed in the home of their maternal great-aunt; however, months later, the great-aunt 12returned the children to the Department, due to “personal problems.” Since then, the children have remained together, but have been placed in various foster homes in several different parishes.
Over the course of one year, the mother sporadically complied with portions of the case plan. However, she failed to comply with the majority of the plan, largely due to her drug addiction and related problems.
On September 24, 2009, the Department was informed that F.B. was the alleged biological father of L.M. Initially, the whereabouts of F.B. were unknown. However, the following year, the Department discovered that F.B. was incarcerated and was a participant in the Ouachita Parish Work Release program. On July 12, 2010, a case worker visited F.B., who verbally acknowledged that L.M. was his daughter. A case plan was formulated and provided to F.B. with regard to L.M. Subsequent DNA testing proved that F.B. was the biological father of L.M.
Meanwhile, on March 26, 2010, a permanency hearing was held. Pursuant to a judgment signed on that date, L.D. and L.M. were placed in the permanent custody of the Department, pending certification of the children for adoption. Subsequently, on August 30, 2010, the Department filed a petition to involuntarily terminate the parental rights of the mother and both fathers, T.D. and F.B. At the time of the hearing, which was held on September 23, 2011, the mother and both fathers were incarcerated.[1] _Jj20nly F.B. and Susan Green, a foster care worker for the Department, testified at the hearing.[2]
Ms. Green testified that the case had been assigned to her since April 2010. She stated that the Department did not discover the whereabouts of F.B. until approximately July, 2010. Ms. Green also stated that F.B. had been incarcerated the entire time the Department had been in contact with him; however, she and F.B. had “had a couple of face-to-face conversations.” She further testified that F.B. had not had any significant contact with L.M. He had not written any letters, made any *457 phone calls or made any effort to communicate with the child. Ms.- Green also stated that F.B. had not provided any financial support for L.M. since the time the child entered state custody. Ms. Green testified that the Department recommended termination of F.B.’s parental rights because he had not communicated with the child and had not provided any significant contributions to the child’s care.
F.B. testified that his current release date is May 18, 2012. He expressed his desire to have a relationship with his daughter and testified that he would be able to provide a home for her after his release from jail. ^According to F.B., he and the child would reside with his grandmother. F.B. testified that he earned $50 every two weeks when he was in the Work Release program in 2010; however, he was not aware that he could have sent money to the Department to financially support his child. He testified that he was never informed that his case plan required him to provide financial support for the child. Additionally, F.B. testified that he was not informed that he could communicate with the child through the Department until “the other day when we had the Parent Team Conference.” F.B. stated that he was aware that he had a case plan, but he believed that the case plan was “[t]o try to do better and find a home.”
When questioned by the court, F.B. testified that he was aware of his case plan but he had never received any copies of case plans pertaining to the child until “the other day.” He testified that he met with Ms. Green for the first time in 2010, and she informed him that “they were trying to terminate the rights.” F.B. stated that he informed Ms. Green that he did not want his parental rights terminated and he asked her how he could avoid having his rights terminated. According to F.B., he had seen L.M. in 2007 and he “felt like she was my daughter.” He stated that he tried to visit her “a couple of times,” but he was prevented from doing so by “her side of her family[.]” F.B. further testified that he had purchased clothing for L.M. on one occasion, but her family refused to accept the clothing, so he gave the items to his sister. He admitted that he “bumped into [the mother’s] sister” in 2010, and she informed him that L.M. was in foster care. He stated that he “tried to find out what was going on,” but claimed that he did not know | ¡¡that he could have contacted the Department to determine the whereabouts of his daughter.
After hearing the testimony, the court found that the Department had failed to prove, by clear and convincing evidence, the grounds set forth in LSA-Ch.C. art. 1015. The court stated:
As it relates to [F.B.], he was sentenced to six years in 2009 and given credit for time served and his [release] date is May of 2012[.]
[[Image here]]
[T]he standard of proof is clear and convincing, and because he is incarcerated, it does not make it automatic termination. You have to take into consideration the amount of time that is involved here as in regards to [F.B.]. Even though he was on Work Release, his income was only fifty dollars every two weeks and he was not advised, according to his testimony, [of his] obligation ... to send money to the State in support of [L.M.]. He was just advised of this at the last Team conference held on the 13th of this month.
[[Image here]]
However, the court made no determination regarding the best interest of the child.
The Department now appeals.
*458 DISCUSSION
The Department contends the juvenile court erred in failing to terminate F.B.’s parental rights. The Department argues that F.B. abandoned L.M. by failing to maintain significant contact by visiting or communicating with her, and by failing to provide significant contributions to her care and support for any period of six consecutive months. The Department also contends F.B. failed to substantially comply with a court-approved case plan for services for a period of three years, and there is no | r,reasonable expectation of significant improvement in F.B.’s condition or conduct in the near future.
LSA-Ch.C. art. 1015 provides, in pertinent part:
The grounds for termination of parental rights are:
[[Image here]]
(4) Abandonment of the child by placing him in the physical custody of a nonpar-ent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
[[Image here]]
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; therd has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
(6)The child is in the custody of the department pursuant to a court order or placement by the parent; the parent has been convicted and sentenced to a period of incarceration of such duration that the parent will not be able to care for the child for an extended period of time, considering the child’s age and his need for a safe, stable, and permanent home; and despite notice by the department, the parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.
* *
17In parental termination proceedings, courts must balance the two private interests of the child and the parents. A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. The child has a profound interest, often at odds with those of his or her parents, in terminating parental rights that prevent adoption and inhibit establishing stable, long-term relationships found in a home with proper parental care. LSA-Ch.C. art. 1001; State ex rel. J.T., 46,174 (La.App.2d Cir.3/2/11), 58 So.3d 1015.
In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. State ex rel. G.J.L., 2000-3278 (La.6/29/01), 791 So.2d 80; State ex rel. A.R.H. v. Hines, 35,800 (La.App.2d Cir.2/27/02), 810 So.2d 1166. *459 In all proceedings, when a ground justifying termination of parental rights is proven, the primary concern is to secure the best interest of the child. Id. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parent to be terminated. Id.
Termination of parental rights is a severe and final action, so the state must satisfy an onerous burden of proof, establishing each element of a ground for termination by clear and convincing evidence. LSA-Ch.C. art. 1035(A); State ex rel. C.M.M. v. T.P.M., 42,238 (La.App.2d Cir.5/9/07), 957 So.2d 330. Although LSA-Ch.C. art. 1015 provides several grounds for involuntary termination of parental rights, only one ground need be established. State ex rel. S.N.W. v. Mitchell, 2001-2128 (La.11/28/01), 800 So.2d 809; State ex rel. J.T., supra.
The purpose of a termination proceeding is to serve the best interest of the child which includes achieving permanency and stability for the child. State ex rel. D.S.C. v. J.C.R., 35,893 (La.App.2d Cir.2/27/02), 811 So.2d 198. The trial court’s factual findings in termination of parental rights cases are subject to the manifest error standard of review. State ex rel. B.H. v. A.H., 42,864 (La.App.2d Cir.10/24/07), 968 So.2d 881; State in the Interest of K.L.B. v. Biggs, 29,512 (La.App.2d Cir.2/28/97), 690 So.2d 965.
Based on this record, we find that it is in the best interest of L.M. to terminate F.B.’s parental rights. L.M. is five years old and has been in state custody four years. According to F.B., he has always known L.M. was his biological child. He testified that he attempted to visit the child “a couple of times” but her family refused to allow him to visit her. He made no attempt to seek legal recourse to establish paternity or to obtain visitation. F.B. also admitted that he learned that L.M. was in foster care in 2010; however, he made no attempt to ascertain the whereabouts of the child, to communicate with the child or to contribute to the child’s care and support. Although F.B. is currently incarcerated, it is clear from his own testimony that he had not made any effort to form a relationship with his child even before his incarceration. He is a complete stranger to L.M., who met him once in 2007, and again only days before the hearing. The main constant in L.M.’s young life is her sister, with whom she shares a close bond. At this point, it | flwould undoubtedly be traumatic to separate L.M. from her sister and attempt to reunite her with a father whom she does not know.
We also find that the Department met its burden of proving that F.B. failed to provide significant contributions to the child’s care and support for a period of six consecutive months and failed to maintain significant contact with the child by communicating with her for a period of six months. There is no question that this child has been in the custody of the Department for nearly four years. Although the DNA results were not received until 2011, F.B. admitted that he knew L.M. was his child. Yet, he did not financially contribute to her care before she entered state custody, nor has he provided for her since then. Additionally, F.B. had seen the child only one time before she entered state custody, and had only made “a couple of’ attempts to visit with her in her entire life. Even after learning that the child was in state custody, F.B. made no attempt to learn her whereabouts, to communicate with her or to contribute to her support. Accordingly, we conclude that *460 the juvenile court was manifestly erroneous in finding that the Department failed to meet its burden of proving the grounds for termination of F.B.’s parental rights.
CONCLUSION
IT IS ORDERED, ADJUDGED AND DECREED that the portion of the juvenile court’s judgment maintaining F.B.’s parental rights to L.M. is reversed. F.B.’s parental rights to L.M. are hereby permanently and irrevocably terminated, and the child is freed for adoption. Costs of this appeal are assessed to the appellee, F.B.
REVERSED AND RENDERED.

. The mother had been arrested and charged with various offenses, including first degree robbery, attempted robbery and unauthorized use of an access card.
On April 26, 2009, F.B. was convicted of theft of a motor vehicle. On that same date, he was sentenced to serve six years at hard labor, suspended. He was placed on supervised probation; however, his probation was revoked following his arrest for domestic abuse.
In 2004, T.D. was charged with the attempted second degree murder of V.M. He was convicted as charged and is currently serving 25 years in prison without benefit of probation, parole or suspension of sentence.

. At the conclusion of the hearing, the court did not issue a ruling with regard to the mother’s parental rights.- The court found that termination of T.D.’s parental rights was in the best interest of L.D. The record before us does not indicate whether T.D. appealed the court's ruling. Thus, the only issues addressed in this appeal pertain to the parental rights of F.B. as to L.M.