DENNIS R. BAGNERIS, SR., Judge.
_JjThis matter involves the involuntary termination of parental rights. The State of Louisiana, Department of Children and Family Services (DCFS), filed a Termi *283 nation of Parental Rights petition to terminate the parental rights of the mother and father of the minor child, D.W.[1] The trial court granted the petition to terminate the father’s parental rights; however, it'' denied the request to terminate the mother’s parental rights. DCFS appeals that portion of the judgment that did not terminate the mother’s parental rights.[2] For the reasons that follow, we find the trial court erred in denying DCFS’ petition to terminate the mother’s parental rights; and accordingly, reverse the judgment.
FACTS/PROCEDURAL HISTORY
• D.W., the minor child, was born on January 2, 2005. He entered foster care on October 29, 2013. The affidavit in support of DCFS’ instanter order alleged -in part that that S.W., the child’s mother, had left him at a school bus stop for the |3fourth time in a three-month period anti that she suffered from substance abuse. It also stated that relatives had no identifying information regarding the child’s father.
On November 19, 2013, D.W. was adjudicated a Child in Need of Care. S.W. and an attorney appointed to represent the interests of both parents attended the adr judication proceeding. The father, identified as A.S., was absent. The record indicated -that he was serving a life sentence in a federal prison in Florida.
S.W. stipulated to the child in need of care adjudication. The. adjudication placed D.W. in the legal and physical care, custody and control of DCFS.
At the dispositional hearing conducted on the same date, the trial court ordered the parent(s) to participate in the following programs to achieve reunification:
- 1) Enroll' in, fully participate in, and successfully complete parenting classes.
2) Submit to "a Mental Health evaluation, submit to all treatment as indicated, fully participate in and successfully complete all counseling and treatment, and consistently take all medication as prescribed.
. 3) Enroll in an inpatient and/or outpatient substance abuse rehabilitation program approved by DCFS, fully . participate in and successfully com- . píete all counseling and treatment,
. consistently take all medications as prescribed and submit to all random and/or .scheduled drug screenings.
4) Fully cooperate with and participate in and successfully complete all services offered and/or recommended in the reunification case plan.
5) Fully cooperate with a parental contribution assessment and make parental contribution payments according to State, pf Louisiana guidelines, no less than $25.00 per month per parent. HOWEVER, EACH PARENT SHALL IMMEDIATELY BEGIN MAKING PAYMENTS OF NO LESS THAN ‡25.00 PER CHILD, EACH AND EVERY MONTH
The parent(s) were further ordered to appear on time for all. evaluations, treatments, services, and programs outlined above; to contact the case manager ^monthly, no later than the 10th day of each month; • to obtain/maintain stable housing; to obtain/maintain stable employment; and to attend all authorized visits.
The initial review hearing was fixed on December 4, 2013. Neither S.W. nor the *284 father attended.[3] The trial record noted that S.W. had been incarcerated in St. Bernard Parish since November 10, 2013. Although S.W. and the father did not attend the hearing, attorneys representing their interests, as well as an attorney representing the child’s interests, were present. As a result of the. hearing, the trial court ordered D.W. to remain in the legal and physical care, custody and control of DCFS in a certified foster home. The trial court advised that the re-únification plan was still in effect; however,' termination of parental rights/ adoption was an option if re-unificatiori could not be successfully achieved. The trial court found S.W. to be in minimal compliance with the court’s orders and the casé plan • for reunification. ”
The interim review hearing took place on March 10, 2014. SW. attended this hearing.[4] The trial court re-urged that the goal of the* case-plan was still re-unification; • however, termination of parental rights was also an option. The trial court noted that S.W. remained incarcerated and that in total non-compliance with the case plan.
The trial court held a permanency planning review hearing on June 11, 2014. S.W.[1] was present at this hearing. The trial court found S.W. in minimal compliance with the re-unification case plan and the father in total non-compliance. It ordered D.W. to remain in the care of DCFS. However, the trial |4court found that it was no longer in D.W.’s best interest to remain in his current certified foster home. DCFS acknowledged that it had submitted a packet to D.W.’s maternal aunt .to have him placed with her. The trial court • recognized that DCFS’ permanency plan included termination of parental rights and/or adoption. The trial court concurred with the. plan. It found that DCFS had made reasonable efforts to provide permanency for D.W. Notwithstanding, it ordered DCFS to make all reasonable efforts to reunite D.W. and his parents.
On July 28, 2014, DCFS filed a Termination Of Parental Rights petition based on abandonment by both parents. The petition noted that S.W. was incarcerated and that the father’ was incarcerated in Florida. Near the time that the petition was filed, D.W.- had begun to live with his great-aunt, R.M. DCFS represented that D.W. had .done well in that .potential adoptive placement.
On September 15, 2014, the trial court held a post-permanency review hearing. The trial court referenced that S.W. was no longer incarcerated.[5] ' DCFS advised the court that since S.W.’s release, she had been in substantial compliance with the case plan. SW.’s “substantial compliance” included timely visits with D.W. and a contribution payment to D.W.’s support of $175.00. ' DCFS advised the trial- court that it -would consider dismissing its termination petition in the event S.W. remained in substantial compliance. D.W. continued to live with R.M., his great-aunt.
S.W. had increased contact with D.W., including unsupervised visits, until January 2015. On January 23, 2015, S.W. did not appear for a drug status hearing. She also did not show for a status hearing on January 26, 2015 and an alias capias was *285 issued for her arrest. On January -30, 2015, it was determined that she ■ had Isgiven a false sample on January 23, 2015; and thereafter, had tested positive for illegal drugs. . ,
A post permanency review hearing was held on January 26, 2015. S.W. and her attorney were present. ‘The trial court ordered that D.W.’s custody remain with DCFS through D.W.’s placement with R.M. The trial court also ordered DCFS to “re-staff’ the case as it relates to the mother’s positive testing for drugs on Friday, January 23, 2015. The case was then set for review on March 10,2015.
S.W. did not attend the March 10, 2015 case review, although her attorney was present. The trial court found S.W. and the father.,were in total non-compliance with the trial court’s orders and the plan for re-unification; however, it authorized supervised visitation between D.W. and his mother.
DCFS filed a second termination of parental rights petition on March 26, 2015. The petition alleged that D.W. -had been abandoned by both parents. As to S.W., the petition.requested termination of her parental rights in accordance with the grounds outlined in La. Ch.C. art. 1015(4) and/or . La. Ch.C. art. 1015(5).[6] In I fisupport, DCFS claimed that S.W. had failed to provide significant contributions to D.W.’s support and faded to maintain significant contact with him. It added that. S.W., was not in substantial compliance with the re-unification plan, including, but not limited to, her failure to attend court-approved visitations; failure, to contribute to court-ordered costs for the. child; failure to .complete a substance abuse program and failure to maintain a safe, stable home. The petition averred that there was no reasonable expectation of significant improvement in her condition in the foreseeable future.
The matter went to trial on June 9,2015. Alicia Turner, the DCFS child welfare specialist assigned to D.W.’s case, testified that the case plan developed for S.W. required S.W. to have a safe living environment; participate in parenting classes; participate in ah inpatient substance abuse program; make parental contributions to D.W.; be available to DCFS and to allow visits; participate and complete a mental health evaluation; and demonstrate a willingness to care for and recognize the needs of the child. Ms. Turner stated that she did not believe S.W. had provided a safe living environment for D.W. because *286 S.W.’s whereabouts had been unknown since January 26, 2015. Ms. Turner said she was unaware of any contact or visits S.W. had with1 D.W. since January 2015 and she was unaware of any parental contributions since the $175.00 contribution made in April 2014. Ms. Turner also advised that S.W. had tested positive for drugs in January 2015 and had not attended Drug Court since that time. Ms. Thr-ner expressed that S.W. had not demonstrated an ability to recognize and care for her child’s needs. Ms. Turner said DCFS concluded it was in D.W’s best interest to be adopted by his great aunt, R.M., with whom he was presently placed.
|7Upon examination by the trial court, Ms. Turner relayed that S.W. consistently visited with D.W. in April 2014. Her last active time in D.W.’s life was from August 2014 to January 2014. Ms. Turner stated that DCFS had conducted a “clear” search, prison inmate search, spoke to relatives and friends, written letters to S.W.’s last known address and made telephone calls to her last known telephone numbers in an effort to contact S.W. Ms. Turner testified that DCFS had not gotten any response from S.W.
R.M., D.W.’s great aunt, testified that D.W. had been in her care for about a year. She verified that S.W. stopped visiting him in January 2015 and had not had any other contact with D.W. R.M. admitted that S.W. had once attempted to call D.W. on R.M’s cell phone. However, she instructed S.W. to refrain from calling D.W. on R.M’s telephone. She also advised S.W. that S.W. was no longer allowed in R.M.’s home. R.M. also testified that S.W. had not provided D.W. with any support or necessities.[7]
On examination by the trial court, R.M. admitted she told S.W. not to call or visit D.W. at'her home in January 2015, near the time of her positive drug test. She explained that she did not appreciate the way that S.W. was “jumping in and out of his life like that.” When the trial, court explained that she did not have the authority to determine when the mother could see the child or to erect barriers to their interaction, R.M. said she was told by Ms, Turner that S.W. no longer had the right to unsupervised visitations or to come to R.M.’s home whenever she wanted to as a result of S.W.’s positive drug test and outstanding arrest warrant.
IsRobert Lequire, the Court Appointed Special Advocate (CASÁ), testified that he had been assigned to D.W.’s case since March 2014. He said he had met with D.W., the mother, and the caretaker. He testified that D.W. was doing well in his current placement and had shown improvement since the mother disappeared in January. Mr. Lequire stated that D.W. expressed to him that his mother needed to get help and that her being away was better for D.W. He added that he had never known R.M. to prevent S.W. from contacting her son. Mr. Lequire advised that he believed it was in D.W.’s best interest to be adopted by R.M.
Upon cross-examination, Mr. Lequire acknowledged that D.W. enjoyed the visits with his mother and that he loved his mother. However, Mr. Leguire also said that he believed D.W. was ready to be adopted by his great-aunt.
Ms. Turner was re-called to testify. She stated that DCFS had developed a plan to reunite D.W. and his mom. The plan included week-end visits by D.W. in R.M.’s home. The plan was never implemented *287 because of D.W.’s failed drug test. Ms. Turner said that S.W. admitted her drug relapse. After the relapse, Ms. Turner said that all visitations with D.W. would have been supervised visits at the DCFS. S.W. agreed to the change in visitation privileges. Ms. Turner also advised R.M. of this change in visitation. Ms. Turner claimed that after S.W.’s drug relapse, S.W. told her that she intended to surrender and give D.W. to a relative.
At the end of the proceedings, the trial court granted the petition to terminate the father’s parental rights and denied the petition to terminate the mother’s parental rights. In reaching its decision, the court explained:
Well, let me say this to you; this has gotten to the point that It’s — you know when you terminate parents’ rights it’s the most severe consé-quences of a parent in terms of their relationship with a child. ' And that there has to be doubt when you terminate a person’s parental rights that they’ve .had every ^opportunity and right to be able to do whatever is necessary to protect, that bond between parent and child. And based on what Ms. Mitchell said to- [S.W.] that [S.W.] has been denied, I think that opportunity.
DCFS filed the following'appeal.[8]
STANDARD OF REVIEW
Appellate courts review trial court’s findings as to whether parental rights should be terminated based on the manifest error/clearly wrong standard.[9] Our Louisiana Supreme Court has consistently set forth the issues that require review in involuntary termination of parental rights as follows: '
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship.. However, the child has a profound interest, often at odds with those of his parents, in terminating parental , rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent.
The State’s parens i patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination- proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide, adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and | ^responsibilities and to achieve permanency and stability for the *288 child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.
Title X of the Children’s Code governs the involuntary termination of parental rights. La. Child Code art, 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. The State need establish only one ground, La. Child. Code art. 1015, but the judge must also find that the termination is in the best interest of the child. La. Child. Code art. 1039. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond.' La. Child. Code art. 1035(A).
State ex rel. KG., 02-2886, pp. 4-5 (La.3/18/03), 841 So.2d 759, 762-63 (citing State in the Interest of J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 81-811; State ex rel C.J.K, 00-2375 (La.11/28/00), 774 So.2d 107) (citations omitted).[10]
Accordingly, in the present matter, this Court must review 1) whether DCFS proved one of the enumerated grounds for termination of parental rights as outlined in La. Ch.C. art. 1015; and 2) review whether the termination of parental rights is in D.W.’s best interests' in order to determine if the trial court erred when it denied DCFS’ petition to terminate S.W.’s parental rights. .
LAW/DISCUSSION
On appeal, DCFS argues that it presented clear and convincing evidence to warrant termination of S.W.’s parental rights based on abandonment by non-support and her failure to substantially comply with the case plan. See La. Ch.C. art. 1015(4) and La. Ch.C. art. 1015(5). Upon presentation of such proof, DCFS | ¶, maintains that the evidence proved it was in the child’s best interest to terminate the mother’s parental rights.
In support of its position that S.W. abandoned D.W. based on non-support, DCFS reiterates .that D.W. entered foster care on October 29, 2013; and pursuant, to the case plan confected in November 2013, S.W. was ordered to contribute a minimum of $25 towards his support'. However, DCFS emphasizes that S.W. only made a one-time support payment of $175 in April 2014 and has failed to provide the minor child with any other support since she last saw him in January 2015.
La. Ch. C. art. 1015(b) provides that abandonment is shown" where the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months, (emphasis added)/ In the event that S.W. is given a $25 monthly credit for her payment of $175, she would have satisfied her support obligation from December 2013 until June 2014, - Based on DCFS unopposed contention that she has not made any other support payments, approximately eight months had lapsed without any contribution towards D.W.’s support when DCFS filed its second parental termination petition on March 26, 2015. Accordingly, we find DCFS submitted clear and convincing evidence to show that S.W.’s failure to support D.W. met the statutory *289 grounds for abandonment based on nonsupport.
DCFS also relies on the testimony of Ms. Turner to support that S.W. was not in substantial compliance with the case plan. DCFS notes that Ms. Turner’s testimony adduced that since January 2015, S.W. failed to-keep regular visitations with D.W.; failed -to provide a safe and stable home; failed to keep regular employment; failed to complete her substance abuse program, failed to keep in contact with DCFS and make her whereabouts known — all of which were in | ^violation of the re-unification case plan. Moreover, DCFS references the testimony of R.M., D.W’s great aunt, who testified that S.W. has not been in contact with D W. .since January 2015. DCFS acknowledges that R.M. may have told S.W. that she'no longer had the right to visit with D.W.’s • in R.M.’s home because of S.W.’s failed drug test. However, DCFS contends it did not instruct R.M. to .tell S.W. that.-she no longer had any visitation rights with the child. DCFS avers that S.W. always retained her rights to supervised visitations and stresses that S.W. never contacted DCFS.to clarify her visitation, rights or her .obligations subsequent to January 2015.
We note that the trial court, in its decision not to terminate S.W.’s parental rights, suggests that S.W. may have thought she did not have the right to contact her minor child-,abased on R.M.’s directives for S.W. not to visit or call D.W. However, this theory is based in supposition. The facts show S.W. presented no evidence to prove that R.M.’s comments were the reasons for her lack of compliance with the case plan. Instead, the record- contains uncontested testimony- from Ms. Turner, the DCFS caseworker. Her testimony establishes that S.W. had not initiated contact with DCFS since January 2015.to inquire about visitation or D.W.’s well-being; and moreover, reveals that S.W. ■ had acknowledged • her substance abuse relapse and her intent “to surrender” and give D.W. to a' relative. Therefore,- in contrast to the trial court’s supposition, we conclude the evidence aligns with DCFS’ contention that S.W. voluntarily and knowingly decided to relinquish her parental rights.
. Upon review, this Court agrees with DCFS that the evidence submitted at the termination hearing demonstrates S.W.’s substantial non-compliance with the case reunification plan. The facts document that S.W..,has not been in contact with haher child, or DCFS for nearly six months. Her whereabouts are unknown; she has no identifiable home or place.of employment; and has offered no emotional. or financial support-to her.child during this time frame. Moreover, this Court does not overlook that S.W. failed to attend the termination-hearing and did not attend the March 10, 2015 permanency review hearing, notwithstanding that she received in-court notice of th.e hearing.
DCFS has put forth' clear and convincing evidence that S.W.'is not in substantial compliance with the case plan and that there exists no reasonable expectation of significant improvement in her conduct in the' foreseeable future; whereas, S.W. has offered no direct evidence to rebut DCFS’ contentions. D.W. has been removed from his mother’s custody in excess of a year. Therefore, we find that DCFS put forth sufficient evidence to terminate S.W.’s parental rights based on substantial noncompliance with the re-unification case plan....
Our jurisprudence establishes 'that La. Ch.C. arts. 1015 and 1039 allow for any one ground to suffice for termination of *290 parental rights.[11] In the present matter, DCFS has presented clear and convincing evidence that meet two statutory grounds to terminate S.W.’s parental rights, namely, abandonment based on non-support and substantial non-compliance with the DCFS case plan. Accordingly, we now turn, to whether DCFS proved it was in D.W.’s best interest to terminate S.W.’s parental rights.
The purpose of a termination proceeding is to serve the best interest of the child, which includes achieving permanency and stability for the child.[12] In the case before us, D.W.’s great aunt stated that' she wanted to adopt D.W. Mr. | uLeguire, D.W.’s CASA representative, testified that D.W. had improved while under the care of the great aunt. Mr. Lequire added that D.W. indicated he was ready to be adopted by the great aunt. He advised that the adoption was in D.W.’s best interest. Similarly, Ms. Turner also testified that it was in the child’s best interest to terminate the parents’ parental rights in order to free D.W. for adoption.
The testimony in the record shows a bond between S.W. and D.W. and mutual love. However, the uncontroverted evidence also shows that SW- has only been consistently involved in the minor child’ life for five months since he entered foster care; has a history of substance abuse and incarceration; has been unable to provide consistent emotional and financial support; has not complied with the case re-unification plan; and that her whereabouts are unknown.
We agree with DCFS that the trial court improperly focused on the best interest of the parent, S.W., when it denied the petition to terminate her parental rights. This focus conflicts with our case law which provides that the interest of the child is paramount over that of the parent’s interest.[13] Although the trial court properly noted that termination of parental rights is a severe and final action; however, our scrutiny of the record shows S.W. was given proper due process opportunities afforded under the law to contest the termination and failed to do so. Therefore, when we balance the interests of the mother and the child in this matter, we find DCFS proved by clear and convincing evidence that it was in D.W’s best interest for all legal relations with his mother to be terminated.
| ^CONCLUSION
DCFS established by clear and convincing evidence that S.W. had abandoned her child; was not in substantial compliance with DCFS’ case plan; and that it was in the child’s best interest to terminate her parental rights. Based on the facts and evidence submitted, we conclude that the trial court was manifestly erroneous when it denied DCFS’ petition to terminate S.W.’s parental rights. Accordingly, the judgment • of the trial court is reversed.
JUDGMENT REVERSED

. We use the initials of the parties to ensure confidentiality and to protect the minor’s identity. See Uniform Rules, Courts of Appeal, Rule 5-2.

. The father does not appeal. Therefore, this appeal is limited only to review the trial court's denial of DCFS' petition to terminate the mother’s parental rights.

. The trial court referenced that the father lived in Miami,

. The father did not attend this hearing. The trial court noted that the father was serving a "life” sentence in Florida. The record indicates that he did not attend any of the remaining scheduled dispositional hearings.

. S.W. was released from jail on August 12, ' 2014.

. La. Ch.C. art. 1015(4) provides:
Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an- intention to permanently avoid parental responsibility by any of the following:
(a) For a period of at least six months as of the time of the hearing, despite a diligent search, the whereabouts of the child’s parent continue to be unknown.
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communication with him for any period of six consecutive months.
[[Image here]]
La. Ch.C. art. 1015(5) provides:
Unless sooner, permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court”‘order;1 there has been no substantial compliance with a case plan for services which has been previously filed by the department and approved by court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the- near future, considering the child’s age and his need for a safe, stable, and permanent home.

. R.M. also said that A.S. had never visited or provided any support to D.W.; nor had anyone acting on the father's behalf.

. The attorney for the child also joined in the appellant’s brief submitted on behalf of DCFS. The record contains no brief lodged by the appellee.

. State ex rel. D.L.R., 08-1541, p. 11 (La.12/12/08), 998 So.2d 681, 687.

. Id. at 11-12, 998 So.2d at 687-688.

. See State ex rel. S.N.W. v. Mitchell, 01-2128, p. 10 (La. 11/28/01), 800 So.2d 809, 816.

. State ex. rel. D.S.C. v. J.C.R., 35,893 (La.App.2d Cir.2/27/02), 811 So.2d 198.

. State ex rel. G.J.L., 00-3278 (La.6/29/01), 791 So.2d 80.